**CRESSWELL v. DIXIE CO. et al.** (No. 428.)

Court of Civil Appeals of Texas. Eastland.
April 6, 1928.

Rehearing Denied May 4, 1928.

**1. Mines and minerals ⊕⟼110—Under evidence, refusal to direct verdict at close of all evidence for plaintiff, suing on contract to drill well to certain depth unless drilling became impracticable, held error.**

In action on contract to drill oil and gas well to certain depth or until salt water should be encountered in such quantities as to make further drilling impracticable, evidence *held* to make refusal to direct verdict for plaintiffs at close of evidence erroneous, regardless of defendants' evidence that further drilling after certain depth would have been unprofitable and that striking salt water indicated they would probably have been unable to drill well to required depth.

**2. Appeal and error ⊕⟼1175(5)—When case is fully developed, appellate court should, in proper case, render judgment notwithstanding verdict.**

In proper case, appellate court should, when case is fully developed and all evidence is presented, render judgment notwithstanding verdict.

**3. Appeal and error ⊕⟼1175(5)—Evidence held to require judgment on appeal for plaintiff suing on contract to drill well to certain depth or until drilling was impracticable.**

In action on contract to drill oil and gas well to specified depth or until salt water made further drilling impracticable under evidence showing abandonment of well at point where it could have been drilled further, in view of fact that case was fully developed, judgment should be rendered, on appeal, for plaintiff for liquidated damages provided in contract, regardless of verdict for defendants.

**4. Damages ⊕⟼68—Plaintiff recovering liquidated damages on contract held entitled to 6 per cent. interest from breach.**

Plaintiff, recovering liquidated damages for breach of contract to drill well, *held* entitled to 6 per cent. interest thereon from admitted date of abandonment.

Appeal from District Court, Eastland County; Geo. L. Davenport, Judge.

Action by G. O. Cresswell against the Dixie Company and others. From a judgment for defendants, plaintiff appeals. Reversed, and judgment rendered for plaintiff.

Funderburk & Richardson, of Eastland, and J. M. Wagstaff, of Abilene, for appellant.

Conner & McRae and Turner, Seaberry & Springer, all of Eastland, for appellees.

HICKMAN, C. J. Appellant, G. O. Cresswell, executed and delivered to appellees the Dixie Company, C. R. Starnes, and G. A. Davisson an oil and gas lease covering about 1,000 acres of land in Callahan county, which contained the following provision:

"Lessees agree and bind themselves to drill, with due diligence, the well already commenced and now being drilled on the Charles Allen land, to a depth of 3,850 feet unless oil or gas is found in paying quantities at a lesser depth, or unless bottom of the Ellenberger lime is encountered at a lesser depth, and unless salt water should be encountered in such quantities as to make further drilling impracticable, and in the event that they fail to so drill said well which has already been started as above mentioned, said lessees acknowledge themselves indebted to lessors in the sum of $2,000 as liquidated damages for their failure to so drill said well."

Suit was instituted by appellant for $2,000 damages for an alleged breach of the contract to drill. In their answer appellees admitted that they had entered into the contract as alleged; that they had abandoned the well

theretofore begun on the Charles Allen land; and that at the time they abandoned same it had been drilled to an approximate depth of 1,850 feet. The only defense pleaded by appellees to appellant's suit was:

"These defendants further say that at said time and under said conditions salt water was encountered in such quantities as to make further drilling impracticable, and that according to the reading, tenor, and effect of said contract these defendants are not indebted to plaintiff in any sum."

The case was submitted to the jury on one special issue, as follows:

"At the time and depth the defendants ceased to drill in the well in question, was salt water encountered in such quantities as to make the further drilling of said well impracticable?"

The jury having answered this issue in the affirmative, judgment was rendered that appellant take nothing, from which judgment this appeal is prosecuted.

[1] Upon the conclusion of the testimony appellant requested a peremptory instruction in his favor, and the refusal of the court so to charge the jury is made the basis of the first assignment of error. A consideration of the evidence in the light of our interpretation of the meaning of the phrase, "Unless salt water should be encountered in such quantities as to make further drilling impracticable," has led us to the conclusion that this assignment should be sustained.

Appellees claimed and were granted, under their admissions, the right to open and close in the introduction of evidence. They offered five witnesses. Three of these witnesses were fact witnesses, and were interested in the subject-matter of the suit to the extent that all were owners of interests in the well which was being drilled on the Charles Allen land at the time of the execution of the lease by appellant. The other two witnesses offered by appellees were expert witnesses, not acquainted with the facts. Briefly, the fact witnesses explained their reasons for abandoning the drilling of the well as follows:

Charles L. Mount testified that, at the time the drilling operations were suspended, he and L. E. Edwards were in charge of the well and had an interest therein. He testified to having encountered a heavy flow of salt water at approximately 1,800 feet, and that it was impossible to drill further with an 8-inch bit; that it became necessary to set the 8-inch casing at that depth, and further drilling would have been with a 6-inch bit. He was not familiar with the formations in Callahan county, and did not know whether salt water was encountered below 1,850 feet in that county at that time.

On cross-examination, he testified:

"It was practical at that time to put in 6-inch casing and go on for further drilling. I didn't put in the 6-inch casing; I didn't have any out there. I didn't or hadn't bought any. After you run your 6-inch casing, you can put another casing down, a 5⅜₆-inch casing. I didn't have any of that out there and I didn't have any of that bought. When we got to 1,800 feet, that is the Dudley sand. We got a big bunch of salt water and looked like we were in a sincaline. I didn't think we would get an oil well. For that reason I wasn't going to undertake to spend a lot of money for 6-inch casing and run it down, and 5-inch casing and run it down. I didn't think it would pay to do it. That was the reason I abandoned the well."

On redirect examination, he testified: That, under the conditions existing in the hole, he could not have reasonably expected to carry the 6-inch casing further than 2,400 or 2,500 feet. That when they got as far as they could with the 6-inch casing, the next size casing would have been the 5⅜₆-inch. That they could probably have carried the well to a depth of 3,000 feet with that size casing. He testified that in some countries they drill holes as small as 4⅞ inches, but in this country the smallest hole that he had heard about was 5⅜₆ inches. He further testified, in summing the matter up on redirect examination, as follows:

"Ordinarily, you would begin your 5-inch hole at 2,800 feet, you would get down that far with your 6-inch casing. In this case, we couldn't have expected to get over 2,400 or 2,500 feet."

And on recross-examination he stated that, if the formations below had been practically free from salt water, they might have been able to drill the 6-inch hole 1,000 feet below the depth where they abandoned the well.

L. E. Edwards testified that he was interested with the witness Mount in the well. He described the conditions and reasons why it was impossible to go deeper with the 8-inch hole very much the same as did the witness Mount, and then testified, on direct examination, that in his opinion as an oil man, and on account of the salt water in the Charles Allen well, further drilling of that well was not practicable.

On cross-examination, he testified:

"As to whether I mean by 'practicable,' that we got down to where we thought it was a dry hole and we wouldn't get any oil, it looked that way. That is what I mean by 'practicable.' As to whether I thought we were in a sincaline, I am not a geologist. With reference to whether I didn't think that we were in a sincaline and it didn't make any difference how much further we went, we wouldn't get any oil, that was my judgment on it. * * * When we got down there in that salt water, as to whether we didn't think there was any oil and we quit, it didn't look favorable."

On redirect examination, he testified:

"Assuming that we could have started at 1,800 feet and run 6-inch casing in, we could have reasonably expected to have gone about 300 or 400 feet, under the conditions that existed there, with the 6-inch casing. Then the

next casing that we would have to run would be the 5⅜. You would have to use a 5-inch bit. From a practical standpoint they don't try to run a smaller casing."

C. F. Corzelius, another interested witness, testified at length to the facts and conditions surrounding the well very much as the other witnesses had testified, and on cross-examination testified as follows:

"It is my best judgment that, by putting in two more strings of casing, I might have gone 2,500 feet—I believe I could have. I didn't try to make that effort because it wasn't practicable. As to whether I don't mean that it was impracticable to go 3,350 feet, it was impracticable to go ahead with the hole with the salt water we had already encountered. It was impracticable as a business proposition and as a drilling proposition. I probably could have gone 3,500 feet. It is possible that the well could have been drilled to 2,500 feet."

On redirect examination, this witness said:

"As to whether I said it was possible to have gone 2,500 feet, I said it was probable. It is a question as to whether or not it could have been drilled to 2,500 feet; I believe it could."

G. Lawson testified as an expert, without any knowledge of the facts. After testifying, in answer to a hypothetical question, that, under the facts, it would have been impracticable to drill this well any deeper, he gave the following testimony on cross-examination:

"There is nothing to keep you from drilling on down from there if you didn't get any more water or red bed. In a wild cat country, you don't know what the formations are for sure. Unless there are unusual water conditions below that place you might drill 1,000 feet deeper before it was necessary to set a smaller casing than the 6″. * * * There would be considerable uncertainty about being able to get the well down to 3,350 feet. But it would be reasonably certain that you could get it down a considerable portion of that distance, say 2,500 feet."

G. L. Gillispie testified as an expert witness. His testimony on direct examination was very similar to that of the witness Lawson.

On cross-examination, he testified:

"If they wanted to go 2,500 feet, I don't know but what they could have done that. I don't know but what they could have gotten a good well at the depth. If there had been a good production sand at 2,500 feet, they very likely would have gotten an oil well."

It is unnecessary to give a summary of the appellant's testimony further than to state that the witness Andrew Urban testified as a practical oil man, familiar with the formations in Callahan county, that:

"After you have passed the depth of 1,800 or 1,900 feet, you are not apt to reach salt water until 2,700 or 2,800 feet."

This testimony was undisputed.

This evidence discloses that appellees sought to justify their act in abandoning the well on two grounds, namely (1) that further drilling would not likely have resulted in the discovery of oil or gas in paying quantities, and it was not, therefore, practicable, from a business standpoint, to do further drilling; or (2) that since they were compelled to anchor their 8-inch casing at a shallow depth, on account of the condition of the hole and the presence of salt water, they would probably not have been able to drill the well to the contract depth of 3,350 feet, and for that reason it was not practicable for them to drill further. We think each view results from an incorrect conception of the meaning of the word "impracticable" as used in the contract. Certain it is that it was not used synonymously with "unprofitable." It is immaterial that appellees decided that further drilling would not result in the discovery of oil or gas. Neither do we think the contract is at all susceptible of the construction that appellees reserved the right to abandon the well and avoid the payment of the damages whenever they decided, or even when it should be demonstrated, that they would be unable to drill to the full depth of 3,350 feet. The provision of the contract was that they should be entitled to abandon the well when salt water made "further drilling impracticable," and not when salt water demonstrated that they would probably be unable to drill to the maximum depth specified in their contract. They were not justified, under the facts, in abandoning this well unless and until further drilling became impracticable.

It is doubtful whether a satisfactory and comprehensive definition of the word "impracticable" could be so framed as to meet every case in which the word occurs. In the case of Des Portes v. Southern Ry. Co., 87 S. C. 160, 69 S. E. 148, it is defined as follows:

"A thing is impracticable when it cannot be accomplished with available means."

In the case of Wooters v. I. & G. N. Ry. Co., 54 Tex. 294, the court had for construction a contract whereby a railroad company obligated itself to locate its depot at the nearest practicable point within one mile of the courthouse. This was construed by our Supreme Court, speaking through Chief Justice Moore, "as binding appellee to locate its depot at the nearest point within a mile of the courthouse, at which it could be done at a reasonable and ordinary cost, with reference to all the circumstances under which it was to be done, and in view of the object and purpose inducing the contract." By the word "impracticable," as used in the contract in the instant case, is meant that the well could not be further drilled by the use of means available to appellees, and at a reasonable cost. , The evidence conclusively establishes

that, by the use of the ordinary tools and equipment employed in the drilling of deep oil wells this well could have been sunk at least a few hundred feet deeper. Nothing indicates that the cost of so doing would have been at all unreasonable. Further drilling was, therefore, not impracticable.

[2, 3] We see no sufficient reason for remanding this case for another trial. The fact witnesses who testified for appellees were all interested witnesses, and know better than any other witness could know just why the drilling of this well was abandoned. Appellees' case had been fully developed. We have the authority, and it is our duty, in a proper case, to render a judgment notwithstanding the verdict of the jury. Henne & Meyer v. Moultrie, 97 Tex. 216, 77 S. W. 607, and the many cases following it.

[4] The judgment of the trial court should be reversed, and judgment here rendered in favor of appellant against appellees for $2,000, with interest thereon at the rate of 6 per cent. per annum from October 1, 1924, the admitted date of abandonment, and it is so ordered.

Reversed and rendered.