

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-11-00335-CV

IN THE MATTER OF C.H., A MINOR
CHILD

----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

----------

## OPINION

----------

A jury found Appellant C.H. delinquent for committing murder and assessed his disposition at thirty years' confinement in the Texas Youth Commission with a possible transfer to the Institutional Division of the Texas Department of Criminal Justice.[1] The trial court adjudicated Appellant delinquent and entered a commitment order in accordance with the jury's verdict. Appellant does not challenge the sufficiency of the evidence. Instead, in his seven issues,

---

[1]*See* Tex. Fam. Code Ann. § 54.04(d)(3)(A) (West Supp. 2012).

Appellant raises voir dire, evidentiary, and jury charge complaints. Because we hold that the trial court did not reversibly err, we affirm the trial court's judgment.

## I. Statement of Facts

### A. The Offense

Eric Robinson (Robinson) got into a disagreement with his sister's boyfriend, Javontae Brown, outside Brown's home. Later that morning, Robinson and Brown spoke on the phone and agreed to meet up for a fist fight. Robinson waited at the agreed-upon site with his brother, Mercedes Smith, and his cousin, Dammion Armstead, but Brown did not show up. Shortly afterward, an incident involving a gun happened between Smith and Brown at another location.

Soon thereafter, Robinson, Armstead, Smith, and two other cousins of Robinson's met with Brown, Appellant, and others at the Green Fields, a park in the Como neighborhood of Fort Worth, to fight. When Robinson began walking toward the opposing group, another man in the group began shooting at Robinson. Smith began to shoot at that group, and then everyone returned to their respective cars and drove off, uninjured.

Smith's fiancée testified that about 1:30 or 2:00 p.m. that day, she saw Appellant, Brown, and another man unloading guns from the trunk of a black Monte Carlo and walking toward a dumpster near the Como community center. She called Smith and told him what she had seen. She then went to visit Smith in person, and they were together until about 3:30 p.m.

Sometime later that afternoon, Smith, Armstead, and Ashton Robinson (Ashton), another cousin, were driving past the Como community center in a Chevy Equinox SUV when they saw Brown and Appellant, armed, outside. Ashton saw Brown holding a handgun up to his chest and standing behind the dumpster. Ashton saw Appellant run toward the back of the property, grab an assault rifle, and run up the hill toward the sidewalk and street. Ashton testified that Appellant shot into the Equinox at his cousins and him repeatedly, killing Smith, but that Brown, although he carried a pistol, never fired a shot.

Armstead testified that he, Smith, and Ashton left their uncle's garage that afternoon and drove down Horne Street. Armstead spotted Appellant standing near the dumpster. As they passed Appellant, Armstead could see that Appellant had "a long gun, like a rifle," with the barrel pointed up. Armstead also saw Brown standing by the dumpster, but he testified that he never saw a gun in Brown's hand during the entire incident. However, Armstead also admitted that he had told the police that Brown had a handgun, shot a couple of times, and ran across the street. Armstead further testified that he had seen the revolver in Brown's hand. Armstead maintained, however, that he never saw Brown with a "long gun" or "big gun."

Smith, who was driving, held a gun in his hand, cocking it on top of the steering wheel as he drove in the vicinity of the community center and the neighboring convenience store. After Armstead told Smith that Appellant had a gun and to keep driving, Smith instead put the car in reverse, backed up to

Appellant and Brown's location, and pointed his gun at Appellant. Armstead testified that Appellant and Brown could not see the gun but also admitted that he really did not know whether they could see it. He maintained that they could not have seen the gun before Smith backed up. Armstead testified that Smith tried to show his gun to Appellant and Brown but that they started shooting before he could get close enough. Armstead admitted that he had not told the police that Smith had backed the car up but insisted that he had told the police that Smith had a gun.

Detective Sarah Waters of the Fort Worth Police Department testified that Armstead told her

> that as they were turning the corner[, Smith] pulled the gun out and cocked it, so that aroused some concern. [Detective Waters] said, what did he do with the gun? And [Armstead] said he held it up and showed it to them to let them know he had a gun for protection.
>
> [Detective Waters] said, did he point it at them? Did he hold it out the window? And [Armstead's] response was no. If he had pointed at them, I figure he would have squoze (sic) one off, meaning he would have shot at them. All he did was hold it up . . . .

Detective Waters further testified that Armstead had told her that "[Smith] held the gun up, just up inside the car, it was not pointed out, it was just held up inside the car, never pointed out the window, never pointed at anyone."

Armstead testified that Appellant and Smith exchanged angry words and that then Appellant began shooting. But Armstead also testified that he did not remember them exchanging words. Instead, Appellant just opened fire when Mercedes backed up; "gunfire was spoken." Smith was shot in the back of the

4

head and died instantly. Armstead heard about six or seven rapidly fired rounds before returning fire. Appellant and Brown left the scene together.

The evidence conflicted regarding whether Appellant or Brown shot Smith. Smith's cousins testified that Appellant shot Smith. An eyewitness who was in the parking lot of the nearby convenience store testified that he heard repeated firing, "more than three or five" rounds, and that he saw the gunman "centered up in the middle of the street." The witness had seen the gunman before but did not know his name. The witness testified that the shooter was not in the courtroom (Appellant was in the courtroom). The witness also said that he saw Appellant get in the front seat of the same car that the shooter got in after the incident. The witness further testified that he never saw Appellant with a gun.

Within hours of the murder, the convenience store manager told the police that he was outside when the shooting occurred, that Appellant was shooting the rifle during the murder, and that he handed it to Brown during the gun battle. At trial, the manager testified that he heard shots from inside the store and went outside to find out what was happening. He testified that he saw Appellant and Brown "jump" in a car, with Brown carrying the rifle, and leave. The store manager testified that he did not see the shooting and that he had told the prosecutor that he was afraid to testify. He also testified without objection that he had heard "on the street" and told the police that Appellant had shot several times and that then Appellant and Brown had switched guns and continued shooting.

5

Homicide Detective Thomas Wayne Boetcher of the Fort Worth Police Department testified that the store manager had told him that he had seen Appellant shooting a rifle at "something down the street." Detective Boetcher also testified that the store manager told him that Appellant then gave the rifle to Brown, who also shot it. Detective Boetcher further testified that the store manager had not indicated that he was scared of retaliation.

Similarly, a female eyewitness, Felicia Houston, told police about a month after Smith's death that both Brown and Appellant were shooting. At trial, she testified that she could not remember whether Appellant had a gun but that she had seen Brown shoot a long gun repeatedly. She admitted that she had identified Appellant in a photo lineup and had told the police that "he was shooting, then ran and got in a car with [another man]." She also testified, however, that even in the photo lineup, it was Brown she associated with the "big gun."

Detective Waters testified that Houston had told her that she had seen Appellant shooting and that in the photo lineups, Houston had identified Appellant and Brown as shooters and Brown as the shooter of the "big gun."

Robinson testified that Houston was Brown's neighbor and had seen some of the events of his altercation with Brown that began that morning.

The jury also saw a black-and-white surveillance video from the convenience store taken at the time of the shooting. It partially captured the shooting.

6

Fifteen .30 shell casings from a .30 assault rifle were found at the scene. Four nine-millimeter casings were also found. The bullet that killed Smith was changed upon firing, and Victoria Lynn Kujala, Senior Forensic Scientist, Firearms, and Tool Mark Examiner at the Fort Worth Police Department Crime Laboratory, testified that she could not say with certainty that it matched the casings, but she also testified that it was consistent with a .30 caliber bullet and that it and a .30 caliber bullet recovered from the Chevy Equinox were fired from the same gun.

## B. Procedural Facts

During voir dire, the State exercised peremptory challenges on the two black veniremembers in the strike zone, and Appellant raised a *Batson*[2] challenge to both. As to one of the venire members struck, the State responded that the panel member had initially said that she could not sit in judgment of another individual and that although she later changed that answer, that alone was a cause for striking her. Additionally, the prosecutor stated that on her jury questionnaire, the veniremember had written that her mother had been arrested for possession of a controlled substance, and "[t]hat would indicate that she may hold that against the State, she's probably not going to be very happy with the State when her mother has been through this process as a Defendant." And also on the questionnaire, in ranking the purpose of the judicial system, "she was

---

[2]*Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712 (1986).

7

supposed to give a ranking to rehabilitation, deterrence, or punishment," but "[s]he wasn't able to fill out the form correctly, and also she checked, she put an "X" by deterrence." The State's attorney took that "to mean that she thinks that deterrence is the most important aspect of punishment in the criminal justice [system], and so that's a race-neutral reason why [he] wanted to strike her as well."

As for the other challenged venire member, the State's attorney pointed out that the jury questionnaire asked about unpleasant experiences with the police, and contended, "She said her daughter was arrested for speeding and tickets and nonpayment, so the race-neutral reason that I struck her was because she's going to hold that against the State." Additionally, "on question number 24, she ranked deterrence as the number one goal of the criminal justice system or the punishment, and that's another race-neutral reason why she was struck."

The trial court implicitly overruled Appellant's *Batson* challenges.[3] Appellant offered no evidence to rebut the State's explanations for the strikes. When he tried to have the jury questionnaires made part of the appellate record about six months after the trial ended, he learned that they had apparently been destroyed after trial.

---

[3]*See id.* at 96–98, 106 S. Ct. at 1723–25; *see also* Tex. R. App. P. 33.1(a); *Thomas v. Long*, 207 S.W.3d 334, 339–40 (Tex. 2006); *Montanez v. State*, 195 S.W.3d 101, 105 (Tex. Crim. App. 2006).

More than three months before trial started, the State filed a notice of potential *Brady*[4] material concerning a conversation that Detective Waters had with the cellmate of co-defendant Brown. The notice states that Detective Waters had informed the State "that a fellow inmate of [Brown] was saying that [Brown] claimed to have been involved in a murder and that he was going to blame or 'pin' responsibility for the crime on the '16 yr old' who also participated in the murder." The notice further states that the State "learned a few days later that the fellow inmate was possibly a person named Eric Jaubert." The notice also states that Detective Waters had said that she was going to investigate this matter.

When Detective Waters testified at trial, Appellant asked her on cross-examination if she had spoken with Jaubert. The State objected on relevance grounds. After an off-the-record discussion, the trial court allowed Appellant to make an offer of proof outside the presence of the jury. Detective Waters acknowledged when asked that Jaubert had made a "vague reference" to a plan by Brown to "pin" the shooting on Appellant. She stated that the information Jaubert gave the police was "somewhat credible, but sketchy" in that it was "very minimal." The State objected to testimony about Jaubert's statements, and the trial court sustained the objection.

---

[4]*Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196–97 (1963).

The trial court's jury charge included self-defense in the abstract portion but did not include self-defense in the application paragraph. The jury charge included both abstract and application paragraphs on the law of parties.

## II. Voir Dire

### A. Jury Questionnaires

In his first three issues, Appellant complains about the destruction of the jury questionnaires. In his first issue, he contends that the rules of appellate procedure require that he receive a new trial because a significant exhibit or portion of the record has been lost or destroyed.[5] Jury questionnaires are not included in the list of items required by rule 34.6 of the rules of appellate procedure to be included in the appellate record.[6] Additionally, the record does not show that Appellant took any timely step below to ensure that the jury questionnaires would be included in the trial record and therefore in the appellate record before us; that is, he did not offer the jury questionnaires into evidence.[7] Further, even though, as the State candidly concedes, the prosecutor discussed the answers of the two veniremembers in the *Batson* hearing, neither Appellant

---

[5]*See* Tex. R. App. P. 34.6(f).

[6]*See* Tex. R. App. P. 34.6(a)(1) ("[T]he reporter's record consists of the court reporter's transcription of so much of the proceedings, and any of the exhibits, that the parties to the appeal designate.").

[7]*See Vargas v. State*, 838 S.W.2d 552, 556–57 (Tex. Crim. App. 1992) (holding that jury questionnaires could not be considered by an appellate court in evaluating a *Batson* claim because they were never before the trial court).

nor the trial court referred to information from the questionnaires, and there is no indication that the parties and the trial court considered the questionnaires themselves to be a significant part of the *Batson* evidence.[8] Consequently, even if the questionnaires had not been destroyed, because they were neither admitted nor treated as evidence in the *Batson* hearing, we would not consider them in this case.[9]

Finally, even if we were to consider as *Batson* evidence that small portion of the questionnaires referred to by the prosecutor in the *Batson* hearing,[10] Appellant's delay in requesting that the questionnaires be made part of the appellate record would foreclose any right he might have to a new trial based on a lost exhibit. Rule 34.6(b) of the appellate rules of procedure provides that "[a]*t or before the time for perfecting the appeal*, the appellant must request in writing that the official reporter prepare the reporter's record."[11] While supplementation of the record is allowed,[12] subsection (f) requires that an appellant seeking a new

---

[8] *See Cornish v. State*, 848 S.W.2d 144, 145 (Tex. Crim. App. 1993) (noting that "defense counsel specifically referred to the juror information cards for the purposes of a comparison analysis and the trial court replied that, '(t)he cards will speak for themselves,'" concluding that the parties and trial judge treated the cards "as a significant part of the [*Batson*] evidence," and therefore holding that the juror information cards could be considered on appeal).

[9] *See Vargas*, 838 S.W.2d at 556.

[10] *See Cornish*, 848 S.W.2d at 145.

[11] *See* Tex. R. App. P. 34.6(b)(1) (emphasis added).

[12] *See* Tex. R. App. P. 34.6(d).

trial based on a lost or destroyed portion of the reporter's record must have first *timely* requested a reporter's record and "*without the appellant's fault*, a significant exhibit or a significant portion of the court reporter's notes and records has been lost or destroyed."[13] In Appellant's original request for a reporter's record, he asked that "a transcript of all proceedings therein, including all pretrial hearings, opening statements, trial testimony and hearings, and post-trial matters in question and answer form as a Reporter's Record be prepared." He did not ask for the jury questionnaires. Appellant did not specifically request that the record be supplemented with the jury questionnaires in the trial court until February 29, 2012, more than six months after the trial ended and after appeal was perfected.[14] Thus, even if we were to treat that portion of the questionnaires referred to by the prosecutor in the *Batson* hearing as a *Batson* exhibit and therefore part of the trial court record, it would not be a timely requested exhibit.[15] Appellant would therefore not be entitled to a new trial under the appellate rules based on the destruction of the jury questionnaires.[16] We overrule Appellant's first issue.

---

[13]*See* Tex. R. App. P. 34.6(f)(1)–(2) (emphasis added).

[14]*See* Tex. R. App. P. 34.6(b), (f)(1)–(2); *Piotrowski v. Minns*, 873 S.W.2d 368, 370 (Tex. 1993) ("At every stage of the proceedings in the trial court, litigants must exercise some diligence to ensure that a record of any error will be available in the event that an appeal will be necessary.").

[15]*See* Tex. R. App. P. 34.6(b), (f)(1)–(2); *Piotrowski*, 873 S.W.2d at 370.

[16]*See id.*

12

In Appellant's second issue, he contends that the destruction of the juror questionnaires constituted a violation of due process under both the federal and Texas constitutions. Appellant does not contend that rule 34.6(f), which we held above does not entitle him to a new trial, is unconstitutional. He also did not raise these contentions below. Because the destruction of the documents happened after the trial court lost jurisdiction, however, we will address the issue in the interest of justice.

Although juvenile delinquency proceedings are civil in nature, the child is entitled to due process and fair treatment because the proceedings may result in the child being deprived of liberty.[17] Even though a juvenile does not have a right to a jury under the federal constitution and may not have such a right under the state constitution,[18] the legislature has given a right to jury trials to juveniles.[19] Because Texas has chosen to grant that right, it must also act in accordance with due process.[20]

---

[17]*In re J.R.R.*, 696 S.W.2d 382, 383 (Tex. 1985); *In re T.L.K.*, 316 S.W.3d 701, 702 (Tex. App.—Fort Worth 2010, no pet.).

[18]*See McKeiver v. Pennsylvania*, 403 U.S. 528, 545, 91 S. Ct. 1976, 1986 (1971) (holding that juvenile has no federal constitutional right to jury trial in adjudicative phase); *In re R.R.*, 373 S.W.3d 730, 730 (Tex. App.—Houston [14th Dist.] 2012, pet. denied) (holding that juvenile has no state constitutional right to jury trial).

[19]*See* Tex. Fam. Code Ann. § 54.03(b) (West Supp. 2012).

[20]*See M.L.B. v. S.L.J.*, 519 U.S. 102, 110–11, 117 S. Ct. 555, 561 (1996) (recognizing that although the federal constitution guarantees no right to appellate review, it is fundamental that once a state affords that right, it must be

Voir dire plays a key role in ensuring the right to an impartial jury by allowing the parties to identify and exclude undesirable jurors.[21] "[C]ounsel must be diligent in eliciting pertinent information from prospective jurors during voir dire in an effort to uncover potential prejudice or bias, and counsel has an obligation to ask questions calculated to bring out information that might indicate a juror's inability to be impartial."[22] Counsel must therefore "not rely on written questionnaires to supply" material data.[23]

Appellant does not challenge appellate rule 34.6(f), the rule put in place by the judiciary for handling record disputes, and we have already held that under that rule, he is not entitled to a new trial. Appellant's lack of diligence during voir dire, especially during the *Batson* hearing, placed him outside that rule's protections. Because Appellant does not challenge the procedures in place and

---

kept free of unreasoned distinctions that can only impede open and equal access to the courts); *Evitts v. Lucey*, 469 U.S. 387, 401, 105 S. Ct. 830, 839 (1985) ("[W]hen a State opts to act in a field where its action has significant discretionary elements, it must nonetheless act in accord with the dictates of the Constitution— and, in particular, in accord with the Due Process Clause."); *In re K.L.*, 91 S.W.3d 1, 5–6 & n.16 (Tex. App.—Fort Worth 2002, no pet.) (citing both *M.L.B.* and *Evitts* for proposition that statutory right to appointed counsel in parental termination cases embodies right to effective counsel).

[21]*Bancroft v. State*, No. 02-10-00040-CR, 2011 WL 167070, at *2 (Tex. App.—Fort Worth Jan. 20, 2011, pet. ref'd) (mem. op., not designated for publication) (citing *Morgan v. Illinois*, 504 U.S. 719, 729, 112 S. Ct. 2222, 2230 (1992)).

[22]*Id.*

[23]*Id.*

because it is not the procedures imposed by the State of Texas but Appellant's failure to timely avail himself of them that resulted in his predicament, we overrule his second issue.

In his third issue, Appellant contends that the destruction of the juror questionnaires violated the public's First Amendment right to access. Even if Appellant has standing to raise this challenge,[24] which we do not hold, he does not challenge section 54.08 of the family code, which allows the trial court to eliminate or restrict the public's access to juvenile trials in some instances,[25] nor does he point to any evidence from the record that this jury trial was closed to the public. Finally, again, the questionnaires are absent from the record not because of the trial court's actions but because Appellant did not timely ensure that the questionnaires were included in the record by offering them into evidence at the *Batson* hearing. We therefore overrule Appellant's third issue.[26]

---

[24] *See Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 471, 472, 102 S. Ct. 752, 758–59 (1982); *Bonilla v. State*, No. 05-11-01489-CR, 2012 WL 6178254, at *3–4 (Tex. App.—Dallas Dec. 12, 2012, no pet.) (not designated for publication).

[25] *See* Tex. Fam. Code Ann. § 54.08 (West 2008).

[26] *See Ibarra v. State*, No. 05-09-01063-CR, 2011 WL 5042081, at *5 (Tex. App.—Dallas Oct. 25, 2011, no pet.) (not designated for publication) (holding that Ibarra was not entitled to a new trial under rule 34.6(f) and not reaching his constitutional complaints because of that holding).

## B. *Batson* Challenges

In his fourth issue, Appellant contends that the trial court erred by overruling his *Batson* challenges.[27] The *Batson* hearing played out as follows:

[Appellant's Trial Counsel]: Prior to them coming in, we'd like racially-neutral reasons as to why 21 and 28 were stricken. We'll make a *Batson* challenge at this time.

THE COURT: All right.

[Prosecutor]: Judge, she has yet to make a prima facie showing, judge.

[Appellant's Trial Counsel]: There were—my client is African-American, Your Honor. The two available jurors of his race were within the strike zone. Both were stricken. The State exercised peremptory challenges on both of the African-American jurors within the strike range. We feel that [Appellant] is entitled to a jury of his peers.

THE COURT: What numbers were those?

[Appellant's Trial Counsel]: Twenty-one and twenty-eight.

THE COURT: All right. Do you wish to respond?

[Prosecutor]: Yeah, I do, Judge. As far as Juror Number 21, as far as the questionnaire, not to mention what she initially, during the voir dire in the questioning, she said she couldn't sit in judgment of another individual. Now, she later changed that, but that alone was the cause for me to strike her, a reason for me to strike her, other than her race. But there is more. On her jury questionnaire, in response to question 16, she says that her mother has been arrested for possession of controlled substance. That would indicate that she may hold that against the State, she's probably not going to

---

[27] *See Goode v. Shoukfeh*, 943 S.W.2d 441, 444 (Tex. 1997) (extending *Batson's* reach to civil cases); *C.E.J. v. State*, 788 S.W.2d 849, 852–58 (Tex. App.—Dallas 1990, writ denied) (holding that *Batson* applies to juvenile delinquency proceedings).

16

be very happy with the State when her mother has been through this process as a Defendant.

In response to question number 20, she said her mother has been arrested for drug addiction, and then second, using me as two-in-two, K-2. I don't know what that means, but it indicates she couldn't fill out the forms correctly. That's another thing, another race-neutral reason I struck her. And also, in response to question number four, rank the highest purpose of the judicial system, she couldn't—she was supposed to give a ranking to rehabilitation, deterrence, or punishment. She wasn't able to fill out the form correctly, and also she checked, she put an "X" by deterrence, and I would take that to mean that she thinks that deterrence is the most important aspect of punishment in the criminal justice [system], and so that's a race-neutral reason why I wanted to strike her as well.

THE COURT: All right.

[Prosecutor]: As far as number 28, in response to her questionnaire, in response to question number 16: "Have you ever or someone— have you or someone close to you ever had an unpleasant experience with the police"? If yes, please describe, and she says yes, so she's had an unfavorable or unpleasant experience with the police. She said her daughter was arrested for speeding and tickets and nonpayment, so the race-neutral reason that I struck her was because she's going to hold that against the State, and also, on question number 24, she ranked deterrence as the number one goal of the criminal justice system or the punishment, and that's another race-neutral reason why she was struck.

THE COURT: All right.

[Appellant's trial counsel]: Thank you, Your Honor.

THE COURT: All right. All right. We'll call in the panel and I'll seat this jury and we'll go to lunch.

As the Texas Court of Criminal Appeals has explained,

A *Batson* challenge to a peremptory strike consists of three steps. First, the opponent of the strike must establish a *prima facie* showing of racial discrimination. Second, the proponent of the strike must articulate a race-neutral explanation. Third, the trial court must

17

decide whether the opponent has proved purposeful racial discrimination.

The trial court's ruling in the third step must be sustained on appeal unless it is clearly erroneous. Because the trial court's ruling requires an evaluation of the credibility and demeanor of prosecutors and venire members, and because this evaluation lies peculiarly within the trial court's province, we defer to the trial court in the absence of exceptional circumstances.[28]

Appellant did nothing in the trial court to satisfy his burden to show that the race-neutral explanations were a pretext for discrimination.[29] He only thanked the trial court after the State offered race-neutral explanations for its peremptory challenges of black veniremembers. We note that it is at this point—voir dire—that Appellant potentially could have effectively and timely relied on the contents of the jury questionnaires to help satisfy his burden and ask that they be made part of the record, not more than six months after the trial ended. Because Appellant has not shown that the trial court's ruling was clearly erroneous, we overrule his fourth issue.

## III. Evidentiary Issues

### A. *Brady* Issue

In his fifth issue, Appellant contends that the State failed to turn over material evidence in violation of *Brady*. Appellant filed his *Brady* motion on April 7, 2011. At trial, he complained that he had never received the name of the

---

[28]*Grant v. State*, 325 S.W.3d 655, 657 (Tex. Crim. App. 2010) (citations omitted).

[29]*See Johnson v. State*, 68 S.W.3d 644, 649 (Tex. Crim. App. 2002).

cellmate. During his offer of proof, he appeared to concede that he had received the name, during his offer of proof, but he then reneged. Appellant now concedes that on April 25, 2011, about two and one-half weeks after he filed his *Brady* motion and more than three months before trial, he received the State's notice of potential *Brady* material and the name of the potential *Brady* witness. That notice provides that Brown's fellow inmate, possibly named Jaubert, had reported that Brown was claiming to have been involved in a murder and planned to place the responsibility for the crime on the "16 yr old" who also participated in the murder. That notice also provides that Detective Waters intended to investigate further.

Detective Waters testified in Appellant's offer of proof that she had videotaped the Jaubert interview and had given the State a copy on April 20. The prosecutor stated on the record that he had "a real good inventory of all the disks [he had] been provided, and [he had] not been provided the interview with Eric Jaubert, either." Detective Waters apologized. The prosecutor then objected to the information "coming in," and the trial court sustained his objection and ordered that "[n]one of this is to be brought up in front of the jury." After the trial court ordered a recess, Appellant stated,

> I'm sorry. I just—regarding my offer of proof, I believe I need to put how I would have handled things differently if I would have received this evidence. I would have subpoenaed Eric Jaubert, or, at a minimum, would have interviewed him myself. I object strenuously to not being allowed to inquire into Detective Waters about this matter.

19

Later, Appellant again requested that he be allowed "to ask this detective in front of this jury, isn't it true that you never provided anyone the name of Javontae Brown's cell mate?" The prosecutor again referred to the State's April 25, 2011 *Brady* notice, filed in the clerk's record and including a certificate of service that he had sent it to Appellant's counsel by mail, email, and/or fax.

Appellant contends on appeal that the State violated *Brady* by failing to disclose and to turn over to him the videotaped police interview with Jaubert. But Appellant never raised that complaint below. To preserve a complaint for appellate review, a party must have presented to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling, if they are not apparent from the context of the request, objection, or motion.[30] If a party fails to do this, error is not preserved, and the complaint is waived.[31] Further, the complaint on appeal must be the same as that presented in the trial court.[32] An appellate court cannot reverse based on a complaint not raised in the trial court.[33] Because Appellant's complaint on appeal differs from his complaint below and is untimely by being first raised on appeal, it is forfeited.[34]

---

[30]Tex. R. App. P. 33.1(a).

[31]*Bushell v. Dean*, 803 S.W.2d 711, 712 (Tex. 1991) (op. on reh'g).

[32]*See Banda v. Garcia*, 955 S.W.2d 270, 272 (Tex. 1997).

[33]*Id.*

[34]*See* Tex. R. App. P. 33.1(a); *Bushell*, 803 S.W.2d at 712; *In re A.C.*, 48 S.W.3d 899, 905 (Tex. App.—Fort Worth 2001, pet. denied) (holding complaint

20

Additionally, we note that Appellant did not request a continuance so that he might watch the video, and the video is not in the appellate record. Thus, even had he preserved his *Brady* claim, Appellant could not satisfy his burden of showing a reasonable probability that earlier disclosure of the video would have changed the outcome of the trial.[35] We overrule Appellant's fifth issue.

### B. Detective Waters's Testimony Concerning Jaubert's Interview

In his sixth issue, Appellant contends that the trial court abused its discretion by excluding Detective Waters's testimony that Jaubert had told her that Brown had stated that he was going to pin the murder on Appellant. As to the trial court's sustaining of the State's relevance objection, we agree with Appellant that evidence that Brown had allegedly admitted to shooting Smith was relevant. Yet, as Detective Waters pointed out in her excluded testimony, "He didn't say he was the only one shooting." Further, other evidence had already been admitted that Brown had shot Smith, and again, the jury charge contained a charge on the law of parties.

Appellant's contention that the exclusion violated his constitutional right to present a defense was not raised below and was therefore forfeited.[36] In the interest of justice, however, we note that our sister court has addressed a very

made first in A.C.'s first amended motion for new trial when he had notice of the issue before trial and during both phases was untimely).

[35] *See A.C.*, 48 S.W.3d at 905.

[36] *See* Tex. R. App. P. 33.1(a); *Bushell*, 803 S.W.2d at 712.

21

similar case. In *Hidrogo v. State*[37], Hidrogo had been convicted of capital murder for killing a man while burglarizing the man's home. Another man, Eddie, admitted his involvement in the burglaries. Hidrogo offered evidence that Brian, Eddie's brother, had confessed that he was involved with Eddie in the murder. But the evidence consisted of text messages ostensibly sent from a phone belonging to Ryleigh LeFlame to Hidrogo's niece. LeFlame's texts stated that Brian had told her "that he was there that day and he shot the dude." Hidrogo attempted to get the contents of the text messages admitted into evidence through various witnesses who had read them, but not through LeFlame. The Eastland Court of Appeals held,

> First, we note that the courts . . . recognized that a defendant has a fundamental right to present evidence of a defense as long as the evidence is relevant and is not excluded by an established rule of procedure or evidence designed to assure fairness and reliability. The Court in *Chambers* determined that the hearsay rule may not be applied mechanistically to defeat the ends of justice. The Court held that Chambers was denied a fair trial by the exclusion of hearsay that constituted a declaration against penal interest (though Mississippi had no hearsay exception for declarations against penal interest at that time) and bore persuasive assurances of trustworthiness. In the present case, the text messages were double hearsay, and the proposed testimony of Clark and others who read the messages bore no such assurance of trustworthiness.

> Second, the application of the hearsay rule to the present case did not deny appellant the opportunity to present his defense. Had appellant sought to introduce Brian's out-of-court statements through LeFlame, the evidence would have been admissible under Tex.R. Evid. 803(24) as statements against interest. The trial court

---

[37]*Hidrogo v. State*, 352 S.W.3d 27 (Tex. App.—Eastland 2011, pet. ref'd), *cert. denied*, 133 S. Ct. 194 (2012).

permitted Leonard Stockinger to testify that he was at LeFlame's house and heard Brian admit to being present when the victim was murdered. According to Stockinger, Brian said he was with Eddie and appellant at the time of the offense, but Brian did not say he shot the victim—only that he spit on the victim. However, there was no such hearsay exception available for the testimony of witnesses such as Clark and her mother because they did not hear Brian's out-of-court statements; they merely read LeFlame's text messages about Brian's statements and attempted to testify regarding the content of LeFlame's out-of-court statements. Appellant was not denied the ability to present a defense; he could have called LeFlame as a witness. We hold that the trial court did not abuse its discretion in excluding the hearsay testimony regarding the text messages.[38]

Similarly, in the case before us, Appellant did not call Jaubert as a witness; he instead attempted to get Jaubert's evidence of Brown's alleged statements before the court through the testimony of Detective Waters even though she described Jaubert's information as "somewhat credible," "sketchy," "not enough to be fleshed out," "very minimal," and "vague innuendo" and described Jaubert as "very strange." Jaubert's information does not bear persuasive indicia of trustworthiness, its exclusion did not prevent Appellant from presenting a defense, and the trial court did not abuse its discretion by excluding it. We overrule Appellant's sixth issue.

## IV. Jury Charge

In his seventh issue, Appellant contends that the trial court erred by omitting his claim of self-defense from the application paragraph in the jury charge. The abstract section of the jury charge provides,

---

[38]*Id.* at 30 (citations omitted).

23

A person is justified in using force against another when and to the degree he reasonably believes the force is immediately necessary to protect himself against the other's use or attempted use of unlawful force.

The use of force against another is not justified in response to verbal provocation alone. The use of force against another is not justified if the person provoked the other's use or attempted use of unlawful force. The use of force against another is not justified if the person sought an explanation from or discussion with the other person while carrying an unlawful weapon.

A person is justified in using deadly force against another if he would be justified in using force against the other, and if a reasonable person in the actor's situation would not have retreated; and when and to the degree he reasonably believes the deadly force is immediately necessary to protect himself against the other's use or attempted use of unlawful deadly force.

"Reasonable belief" means a belief that would be held by an ordinary and prudent person in the same circumstances as the actor.

"Deadly force" means force that is intended or known by the actor to cause death or serious bodily injury, or in the manner of its use or intended use is capable of causing death or serious bodily injury.

The application paragraph does not mention or allude to self-defense at all.

At trial, Appellant did not lodge an objection to the charge. As the Supreme Court of Texas recently explained,

The Family Code provides that in juvenile justice cases, (t)he requirements governing an appeal are as in civil cases generally. In civil cases, unobjected-to charge error is not reversible unless it is fundamental, which occurs only in those rare instances in which the record shows the court lacked jurisdiction or that the public interest is directly and adversely affected as that interest is declared in the statutes or the Constitution of Texas. Fundamental error is reversible if it probably caused the rendition of an improper judgment (or) probably prevented the appellant from properly presenting the case to the court of appeals. But . . . a juvenile proceeding is not

24

purely a civil matter. It is quasi-criminal, and . . . general rules requiring preservation in the trial court . . . cannot be applied across the board in juvenile proceedings. In criminal cases, unobjected-to charge error is reversible if it was egregious and created such harm that his trial was not fair or impartial, considering essentially every aspect of the case. If, for example, [i]t is . . . highly likely that the jury's verdicts . . . were, in fact, unanimous, unobjected-to charge error is not reversible.[39]

The Supreme Court of Texas chose not to decide whether the civil standard or *Almanza*[40] applies to jury charge error in juvenile cases, noting that in the case before it, the application of either standard would not result in a reversal.[41] We therefore follow several other intermediate courts in applying the *Almanza* standard of review for unpreserved jury charge error.[42]

As the Texas Court of Criminal Appeals recently reaffirmed,

The trial judge is ultimately responsible for the accuracy of the jury charge and accompanying instructions. . . . The trial judge has the duty to instruct the jury on the law applicable to the case even if defense counsel fails to object to inclusions or exclusions in the charge. But Article 36.14 imposes no duty on a trial judge to instruct

---

[39]*In re L.D.C.*, 400 S.W.3d 572, 574–75 (Tex. 2013) (*L.D.C. II*) (citations and internal quotation marks omitted).

[40]*Almanza v. State*, 686 S.W.2d 157, 171–72 (Tex. Crim. App. 1985) (op. on reh'g).

[41]*L.D.C. II.*, 400 S.W.3d at 575–76.

[42]*See In re L.D.C.*, 357 S.W.3d 124, 132 (Tex. App.—San Antonio 2011) *rev'd*, L.D.C. *II*; *In re A.C.*, No. 11-09-00164-CV, 2011 WL 3925516, at *6 (Tex. App.—Eastland Sept. 8, 2011, pet denied) (mem. op. on reh'g); *In re A.E.B.*, 255 S.W.3d 338, 350 (Tex. App.—Dallas 2008, pet. dism'd); *In re K.W.G.*, 953 S.W.2d 483, 488 (Tex. App.—Texarkana 1997, pet. denied). *But see In re A.A.B.*, 110 S.W.3d 553, 555–60 (Tex. App.—Waco 2003, no pet.) (applying the civil standard).

the jury *sua sponte* on unrequested defensive issues because an unrequested defensive issue is not the law applicable to the case. A defendant cannot complain on appeal about the trial judge's failure to include a defensive instruction that he did not preserve by request or objection: he has procedurally defaulted any such complaint.

However, if the trial judge does charge on a defensive issue (regardless of whether he does so *sua sponte* or upon a party's request), but fails to do so correctly, this is charge error subject to review under *Almanza*. If there was an objection, reversal is required if the accused suffered "some harm" from the error. If no proper objection was made at trial, a reversal is required only if the error caused "egregious harm."[43]

In the case before us, the trial court sua sponte included the law of self-defense in the abstract portion of the charge. But the trial court failed to apply the abstract instruction to the facts of the case. "[H]aving undertaken on its own to charge the jury on this issue, the trial court in this case signaled that self-defense was the law applicable to the case."[44] Therefore, the omission of the law of self-defense from the application portion of the charge is error.[45]

Appellant contends that the omission of the law of self-defense from the application paragraph deprived him of a fair and impartial trial, causing him egregious harm. But as the Texas Court of Criminal Appeals reaffirmed in *Vega*, to determine whether a defendant suffered egregious harm under *Almanza*, we

---

[43] *Vega v. State*, 394 S.W.3d 514, 518–19 (Tex. Crim. App. 2013) (citations and most internal quotations omitted).

[44] *Barrera v. State*, 982 S.W.2d 415, 416 (Tex. Crim. App. 1998) (citations and internal quotation marks omitted).

[45] *See id.*

26

must consider the jury charge, the evidence, including the weight of probative evidence, contested issues, jury argument, and any other relevant information in the record.[46]

The evidence shows that Smith and his group had already faced off an opposing group including Brown and Appellant at least once that day. The evidence also shows that Brown and Appellant appeared to be preparing for a gunfight around two hours before the shooting, as they were seen unloading weapons near the dumpster by the community center.

There is no direct evidence that Appellant or Brown saw Smith pointing a gun at them before he was killed with a bullet from an assault rifle. Armstead testified that Appellant and Brown could not see the gun but also admitted that he did not know whether they had seen it. He maintained that they could not have seen the gun before Smith backed the Equinox up and that Smith tried to show it to them but was killed before he could get close enough to demonstrate his own weapon.

Appellant did not call any witnesses, and in addition to self-defense law in the abstract portion, the jury charge included both abstract and application paragraphs on the law of parties.

Appellant's theory of the case was that he was an innocent bystander at the scene of Smith's murder and that he had been mistakenly identified as the

---

[46] *Vega*, 394 S.W.3d at 521.

27

shooter. Appellant's counsel explicitly told the jury during closing arguments that

Appellant was not claiming self-defense:

> [R]eally, if I were representing Javontae Brown, I would be arguing self-defense, but [the prosecutor] indicated—I expect they're going to argue self-defense. How could he be defending himself if he wasn't involved? Javontae Brown, probably a real good self-defense argument. [Appellant]? No. He wasn't involved.

As our sister court in Austin has explained,

> Self-defense, like other chapter nine defenses, justifies conduct that would otherwise be criminal. In other words, the defendant must "admit" violating the statute under which he is being tried, then offer a statutory justification for his otherwise criminal conduct. Thus, a defendant is not entitled to a jury instruction on self-defense if, through his own testimony or the testimony of others, he claims that he did not perform the assaultive acts alleged, or that he did not have the requisite culpable mental state, or both.[47]

The State explained the law of self-defense in its closing argument and

argued that it was not applicable because

> We have absolutely no proof from any source that [Appellant] or Javontae Brown saw a gun in Mercedes[ Smith's] hand. Dammion [Armstead] was vague about how that gun was handled. He also said that the window was partially up or partially down. We have no proof from any source that those two fellows [Appellant and Brown] saw that gun. None. We also know this: They had a rifle. Again, a rifle is used to hit targets at long-range, not for self-defense.

> Did they provoke the fight? Well, the fight was going on all day long.

---

[47] *VanBrackle v. State*, 179 S.W.3d 708, 715 (Tex. App.—Austin 2005, no pet.) (citations omitted); *see also Ex parte Nailor*, 149 S.W.3d 125, 132–33 (Tex. Crim. App. 2004) (holding that because Nailor's testimony and closing argument focused on the theory of accident, denying the mental state required for assault, he was not entitled to self-defense instruction).

Did Mercedes Smith fire a gun? No. There is nothing in the ballistics, there is nothing in the chart at the scene of the crime that will support that Mercedes Smith fired a weapon, or, for that matter, that he even displayed a weapon that was seen by [Appellant] and Vontae [Brown], so I'll urge you to disregard self-defense, no matter how much they proclaim it.

Based on all the above, we hold that the trial court's omission of the law of self-defense from the application paragraph was harmless error. We overrule Appellant's seventh issue.

## V. Conclusion

Having overruled Appellant's seven issues, we affirm the trial court's judgment.

LEE ANN DAUPHINOT
JUSTICE

PANEL: DAUPHINOT, WALKER, and MEIER, JJ.

DELIVERED: September 12, 2013